OPINION OF THE COURT
 

 Graffeo, J.
 

 The issue presented in this case is whether the State Department of Taxation and Finance exceeded its authority when it denied the sales tax refund claims of a financial services company that did not pay the sales taxes underlying the refund requests. We conclude that denial of the refund claims was authorized by the sales tax statutory and regulatory scheme and we therefore affirm the judgment of the Appellate Division confirming the determination of the Tax Appeals Tribunal.
 

 Petitioner General Electric Capital Corporation provided financing services for private label credit cards issued by retail vendors. Typically, the retail vendors offered credit cards to their customers under their store names. When the customers used the credit cards to purchase merchandise from the vendors, the vendors remitted the sales taxes due on the retail transactions to the Division of Taxation of the New York State Department of Taxation and Finance.
 

 In account purchase agreements entered into between 1990 and 1996, particular retail vendors assigned their rights under credit agreements with their customers to petitioner. Petitioner purchased these accounts for the face amount of the total indebtedness, which included any sales taxes financed by the vendors at the time of the purchases—taxes the vendors had already paid to the Division. After unsuccessfully attempting to collect the debts owed from the customers, petitioner ultimately determined that certain accounts were uncollectible. It charged off these “bad debts” on its own financial records and deducted the amounts of the uncollectible debts from its income for federal income tax purposes.
 

 
 *252
 
 In February 1997 and April 1998, petitioner filed claims with the Division seeking refunds in the amount of $3,076,247 for sales taxes paid by retail vendors relating to the uncollectible accounts. The Division denied the refund claims in July 1998 on the ground that petitioner was not the vendor at the original taxable sales or the party that had paid the sales taxes to the State. Petitioner protested, challenging the validity of 20 NYCRR 534.7 (b) (3), the regulation relied on by the Division in denying the refund claims. That regulation expressly precludes third-party assignees such as petitioner from applying for a refund for sales taxes arising from a bad debt. Petitioner asserted that the regulation was inconsistent with the enabling legislation, Tax Law § 1132 (e), and argued that the General Obligations Law provisions regarding assignments precluded denial of a refund claim made by an assignee of a retail vendor who would have been eligible to apply for a sales tax refund.
 

 The Administrative Law Judge denied the protest petition and petitioner appealed to the Tax Appeals Tribunal, which also upheld the Division’s decision denying the refunds. The Tribunal explained that, unlike the retail vendors, a third-party finance company has no trustee relationship with the State with respect to the collection of sales taxes. The State, therefore, has no concomitant obligation to refund sales taxes paid on transactions that later became uncollectible debts. Referencing Tax Law § 1139 (a), which sets forth the procedure for pursuing a sales tax refund claim, the Tribunal noted that petitioner did not fall within any of the categories of applicants eligible to seek a sales tax refund, each of which had a more direct connection to the purchase transaction that gave rise to the sales tax obligation in the first instance. Absent such a connection, the Tribunal noted that the field of entities that could potentially seek a sales tax refund “would be virtually limitless and the orderly administration of the sales tax rendered unworkable, at best.”
 

 Unsuccessful on administrative appeal, petitioner commenced this original proceeding in the Appellate Division challenging the determination of the Tax Appeals Tribunal. That Court confirmed the determination denying the sales tax refund claim, concluding that 20 NYCRR 534.7 (b) was consistent with Tax Law § 1132 (e), and its restriction on the class of applicants eligible to seek a sales tax refund was not precluded by the assignment provisions in the General Obligations Law. This Court granted petitioner’s application for leave to appeal and we now affirm.
 

 
 *253
 
 Tax Law § 1132, enacted in 1965 (L 1965, ch 93), deals with the collection of sales taxes from customers. Subdivision (e) provides:
 

 “The tax commission may provide, by regulation, for the exclusion from taxable receipts, amusement charges or rents of amounts representing sales where the contract of sale has been cancelled, the property returned or the receipt, charge or rent has been ascertained to be uncollectible or, in case the tax has been paid upon such receipt, charge or rent, for refund of or credit for the tax so paid. . . .”
 

 As the word “may” suggests, the statute does not require that the Division grant refunds on uncollectible debts to any class of applicants.
 

 Consistent with the explicit grant of authority to issue regulations, the Commissioner of Taxation and Finance promulgated 20 NYCRR 534.7 (b) (1), which states that “[wjhere a receipt . . . has been ascertained to be uncollectible, either in whole or in part, the vendor of the tangible personal property . . . may apply for a refund or credit of the tax paid on such receipt.” Under the regulation, a leased department or concession of the vendor, or a finance company wholly owned by the vendor (referred to as a captive finance company), is recognized as standing in the shoes of the vendor for purposes of pursuing a refund request. A refund is not available, however, “for a transaction which is financed by a third party or for a debt which has been assigned to a third party” (20 NYCRR 534.7 [b] [3]).
 

 Petitioner acknowledges that it is neither a leased concession or department of the retail vendors nor a captive finance company, but is a third party as that term is used in 20 NYCRR 534.7 (b) (3). Thus, petitioner does not dispute that its refund request falls squarely within the prohibition designated in the regulation. Rather, it asserts that the Division erred in denying the refund because the regulatory restriction is not authorized by Tax Law § 1132 (e), and because it violates the broad assignment provisions in the General Obligations Law. We disagree with both arguments.
 

 We interpreted a predecessor regulation in
 
 Matter of Abraham & Straus v Tully
 
 (47 NY2d 207 [1979]), a case involving a refund claim filed by a retail vendor. There, we concluded that the State Tax Commission’s method of computing the extent of a refund based on the vendor’s uncollectible debts was irrational.
 
 *254
 
 Rather than proportionately allocating partial payments to the percentage of debt arising from sales taxes, the Commission’s auditors credited partial payments received from customers first toward the total amount of sales taxes owed on the transaction, thereby reducing the amount of the sales tax refund a vendor could claim on an uncollectible debt. Because the Commission’s procedure for calculating the refund amount made the vendor disproportionately liable for sales taxes, we affirmed the judgment of the Appellate Division annulling the determination. We therefore held in
 
 Abraham & Straus
 
 that if the State decides to authorize a particular entity to seek a refund, it must calculate that refund fairly. But since the case involved a claim filed by a vendor who remitted sales taxes to the State, it did not address the issue presented in this case: whether the regulation precluding third parties from obtaining sales tax refunds is enforceable.
 

 “The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation”
 
 (Matter of Nicholas v Kahn,
 
 47 NY2d 24, 31 [1979]). In so doing, an agency can adopt regulations that go beyond the text of that legislation, provided they are not inconsistent with the statutory language or its underlying purposes
 
 (Goodwin v Perales,
 
 88 NY2d 383, 395 [1996]).
 

 This regulatory authority is, of course, not unbridled. “As an arm of the executive branch of government, an administrative agency may not, in the exercise of rule-making authority, engage in broad-based public policy determinations”
 
 (Rent Stabilization Assn. of N.Y. City v Higgins,
 
 83 NY2d 156,169 [1993],
 
 cert denied
 
 512 US 1213 [1994]), and may adopt only rules and regulations which “are in harmony with the statute’s over-all purpose”
 
 (Goodwin v Perales,
 
 88 NY2d at 395). That being said, where an agency adopts a regulation that is consistent with its enabling legislation and is not “so lacking in reason for its promulgation that it is essentially arbitrary”
 
 (Matter of Bernstein v Toia,
 
 43 NY2d 437, 448 [1977] [citation omitted]), the rule has the force and effect of law
 
 (see Molina v Games Mgt. Servs.,
 
 58 NY2d 523, 529 [1983]).
 

 Here, the Legislature enacted a statute—Tax Law § 1132 (e)—that permitted but did not require the Division to provide
 
 *255
 
 refunds for sales taxes paid on uncollectible debts.
 
 [1]
 
 This legislation expressly directed the Commissioner to formulate regulations establishing the circumstances, if any, under which uncollectible debts would be excluded from taxable receipts. 20 NYCRR 534.7 (b) does just that; it indicates what entities are eligible to apply for a sales tax refund and under what circumstances a refund will be granted.
 

 The regulation narrowly addresses sales tax refunds arising from uncollectible debts, subject matter specifically referenced in the enabling legislation. Unquestionably, by its terms, Tax Law § 1132 (e) allows the Division to exclude uncollectible debts from “taxable receipts.” With respect to the underlying purchase transactions in this case, the retail vendors were the only entities who had taxable receipts—they alone were responsible for paying sales taxes to the Division at the time of the taxable transactions (see Tax Law § 1101 [b] [3]; § 1105 [a]).
 

 Having determined that the statute granted the Commissioner authority to promulgate regulations regarding refunds for uncollectible debts, we turn to whether the Commissioner articulated a rational explanation for distinguishing between who is and who is not permitted to seek sales tax refunds. The Commissioner contends that the limitation on the assignment of sales tax refund claims to third parties is necessary to avoid excessive administrative burden and facilitate the orderly administration of the sales tax. The rationality of this explanation is manifest when it is considered in the context of the sales tax statutory scheme.
 

 
 *256
 
 Retail vendors collect taxes as “trustee[s] for and on account of the state” (Tax Law § 1132 [a] [1]). They are subject to special registration and record-keeping requirements (Tax Law §§ 1134, 1135) and are “personally liable for the tax imposed, collected or required to be collected under [the sales tax] article” (Tax Law § 1133 [a]). Offering retail vendors the benefit of a refund or credit on sales taxes for uncollectible debts offsets the significant responsibilities imposed on them and fosters the trustee relationship between the vendors and the State, thereby encouraging accurate reporting of taxable sales and prompt payment of sales taxes.
 

 Third-party finance companies do not carry the burden of collecting sales taxes as a trustee of the State, nor does the Division have any trustee relationship with assignees such as petitioner to provide a basis for tracking the underlying transactions giving rise to the debts acquired by these companies. Thus, it was not arbitrary or capricious for the Commissioner to authorize retail vendors to pursue refund claims pertaining to debts that eventually became uncollectible while precluding third parties, who do not have taxable receipts and never paid the taxes in the first instance, from doing so.
 

 Indeed, the regulatory restriction at issue corresponds with a provision in the general sales tax refund statute, Tax Law § 1139, which addresses the procedure for filing a refund claim. Section 1139 (a), applicable to refund claims arising from uncollectible debts
 
 (see
 
 Tax Law § 1139 [e]), identifies three types of sales tax refund applicants, each of whom paid sales taxes (either to the retail vendor, who then forwarded the taxes to the Division, or directly to the Division). Consistent with section 1139 (a), 20 NYCRR 534.7 allows a party who remitted sales taxes to seek a refund. The rule is therefore rational, entirely consistent with sections 1132 (e) and 1139 (a), and does no more than “fill in the interstices in the legislative product”
 
 (Matter of Nicholas v Kahn,
 
 47 NY2d at 31). As a duly promulgated regulation in harmony with its enabling legislation, 20 NYCRR 534.7 has the force and effect of law and the Division properly relied on it to deny the refund claims.
 

 Petitioner’s contention that Tax Law § 1132 (e) “merely gives the . . . Commissioner the right to universally allow refunds and credits on uncollectible receivables” (appellant’s brief, at 30-31) finds no support in the language or legislative history of that provision
 
 (see
 
 L 1965, ch 93). The Legislature’s grant of authority to the Commissioner in this instance was both
 
 *257
 
 specific—an explicit direction to issue regulations addressing sales tax refunds for uncollectible debts—and broad, with the Commissioner authorized to make the determination whether any party would be eligible to receive such a refund. Tax Law § 1132 (e) places no limitation on the Commissioner’s power to determine the types of parties that could qualify for this benefit. Here, the Commissioner’s decision to foreclose refunds by parties who never paid taxes and are removed from the taxable retail transaction was neither irrational nor inconsistent with Tax Law § 1132 (e). We therefore have no basis to disturb it.
 

 Petitioner also maintains that the regulation violates the broad assignment provisions in General Obligations Law § 13-101, which states that “[a]ny claim or demand can be transferred” except in certain enumerated circumstances not relevant here, or when such a transfer is “expressly forbidden” by statute or “would contravene public policy.” (§ 13-101 [3].) Asserting that no statute expressly precludes the assignment of a sales tax refund claim, petitioner submits that the retail vendors were free to assign the debts and, once the debts became uncollectible, it assumed their entitlement to apply for refunds, thereby standing in the shoes of the retail vendors.
 
 [2]
 

 This argument fails to account for General Obligations Law § 13-105, which clarifies under what circumstances a transferred claim can be enforced in an action or special proceeding. Section 13-105 states that where a claim is lawfully transferred, it is generally enforceable with one important caveat: “this section does not apply, where the rights or liabilities of a party to a claim or demand, which is transferred, are regulated by special provision of law.” In this case, the rights of parties to apply for sales tax refunds from the Division are closely regulated under Tax Law § 1132 (e), § 1139 (a) and 20 NYCRR 534.7. By the plain terms of General Obligations Law § 13-105, where there is a conflict between a “special provision of law” and the general assignment statute, the former governs
 
 *258
 
 enforcement of the transferred claim. Here, even if we assume that the claims were lawfully assigned, the relevant Tax Law statute and regulation would govern petitioner’s eligibility to apply for a sales tax refund.
 

 General Obligations Law § 13-101 itself contains exceptions that recognize that its provisions can be trumped by specific statutes or public policy concerns and we have relied on those exceptions in rejecting a similar challenge to a regulation. In
 
 Matter of Medical Socy. of State of N.Y. v Serio
 
 (100 NY2d 854, 871-872 [2003]), we held that section 13-101 did not preclude the Superintendent of Insurance from promulgating a regulation that prohibited no-fault claimants from assigning benefits for non-health-related services, even though no statute expressly prohibited transfer of such claims. We noted that the Superintendent possessed special expertise in the closely-regulated arena of no-fault benefits and the rule furthered the State’s public policy by discouraging fraud.
 

 Like the no-fault benefits at issue in
 
 Medical Society,
 
 this case involves a purely statutory benefit (without Tax Law § 1132 [e] and 20 NYCRR 534.7, no taxpayer would be entitled to obtain a sales tax refund arising from an uncollectible debt) in a closely-regulated arena where the Legislature has relied on the Commissioner’s special expertise. Here, the Legislature’s delegation of authority was especially broad in that the Commissioner was vested with the discretion to decide whether refunds should ever be allowed for bad debts. We have already concluded that the regulation is valid and has the force and effect of law and, since we look to statutes and their implementing regulations to ascertain public policy
 
 (see Matter of Economico v Village of Pelham,
 
 50 NY2d 120, 126 [1980];
 
 see e.g. Slayko v Security Mut. Ins. Co.,
 
 98 NY2d 289, 295 [2002]), the restriction on the assignment of refund claims falls within the exception to the general assignment provisions set forth in General Obligations Law § 13-101 (3).
 

 Contrary to petitioner’s assertion, our holding does not result in a “windfall” for the State. By statute, sales taxes are due in full at the time of the taxable transaction, which is completed upon the transfer of title or possession of the tangible personal property to the customer (Tax Law § 1101 [b] [5]). The taxable event is the retail sale, regardless of whether the customer pays the taxes in cash or the taxes become a portion of the amount financed by the retail vendor
 
 (see
 
 Tax Law § 1101 [b] [3]; § 1105
 
 *259
 
 [a]).
 
 [3]
 
 In this case, the customers took possession of the merchandise at the time of the retail sale. Although the customers later defaulted on their obligations to repay the amounts borrowed, the transactions giving rise to the sales taxes were not voided. Thus, the Division lawfully collected the sales taxes when the retail sales occurred—before petitioner bought the accounts from the retail vendors—and nothing has occurred that changed the status of the underlying transactions from taxable to nontaxable. As such, there is no “windfall.”
 

 The dissent asserts that by refusing to entertain refund claims by parties who never paid sales taxes, the Commissioner is somehow making those parties “bear the sales tax burden” or seeking to collect a tax on a sale that was “never consummated”
 
 [4]
 
 in circumstances where “there is no sales transaction” (dissenting op at 261, 262, 263). This argument misapprehends both the facts and the statutory scheme. In this case, petitioner purchased commercial paper (undifferentiated debt) from retail vendors in transactions that did not involve the transfer of tangible personal property and therefore were not subject to the application of sales taxes. Petitioner has not borne any sales tax burden, nor is the Commissioner attempting to collect anything
 
 *260
 
 from petitioner. To the contrary, it is petitioner who wishes to collect a tax refund from the Commissioner.
 

 Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
 

 R.S. Smith, J. (dissenting). Regulations of the Department of Taxation and Finance, promulgated pursuant to Tax Law § 1132 (e), provide for the refund or credit of sales tax payments where the purchase price of the item sold proves uncollectible. At issue here is the validity of one section in those regulations, 20 NYCRR 534.7 (b) (3), which provides: “A refund or credit is not available for a transaction which is financed by a third party or for a debt which has been assigned to a third party, whether or not such third party has recourse to the vendor on that debt.” I believe that section 534.7 (b) (3) is inconsistent with both the Tax Law and the General Obligations Law, and so is invalid on two independent grounds. I therefore dissent.
 

 I
 

 The basis for my view that the regulation violates the Tax Law is that the sales tax imposed by Tax Law § 1105 was designed to be a tax whose burden falls upon purchasers. It was not intended as a direct burden on vendors or their successors in interest. Yet the regulation challenged here permits the state treasury to retain, and prohibits a vendor’s assignee from recovering, 474% (or more, where the sales tax is higher) of the amount a purchaser was
 
 supposed
 
 to pay, in situations where the purchaser has not paid a penny. Section 534.7 (b) (3) thus contradicts the thrust of the sales tax statute, while accomplishing no discernable purpose except the enrichment of the State.
 

 Although vendors are required to collect and pay sales tax as a matter of administrative convenience, the statute makes quite clear that the pocketbook being targeted is the purchaser’s. The tax is imposed upon the vendor’s “receipts” (Tax Law § 1105 [a]), and while “receipts]” is defined to include “any amount for which credit is allowed by the vendor to the purchaser” (Tax Law § 1101 [b] [3]), nothing in the statute suggests an intention to tax as “receipts” sums that the vendor never in fact receives. On the contrary, Tax Law § 1132 (e) says that the State Tax Commission “may provide, by regulation, for the exclusion from taxable receipts ... of amounts representing sales where the contract of sale has been cancelled, the property returned or the receipt . . . has been ascertained to be uncollectible.” (As I explain below, I think the majority reads too much into the word “may” in this section of the statute.)
 

 
 *261
 
 The statute not only permits, but requires, the vendor to pass on the burden of the tax to the purchaser. Under Tax Law § 1132 (a) (1): “[e]very person required to collect the tax shall collect the tax from the customer .... If the customer is given any sales slip, invoice, receipt or other statement or memorandum of the price . . . the tax shall be stated, charged and shown separately . . . .” Vendors are forbidden to “advertise or hold out to the public in any manner, directly or indirectly, that the tax is not considered as an element in the price . . . payable by customers” (Tax Law § 1133 [d]).
 

 Thus, when a vendor parts with merchandise that a customer has paid for, the vendor does not directly bear the burden of the sales tax. (Of course the sales tax often burdens vendors indirectly, by reducing their sales or impelling them to charge lower prices, but this kind of indirect consequence is not the same as the direct burden of paying the tax.) And obviously, where the vendor retains his merchandise and receives no payment—i.e., where no sale takes place—the vendor does not bear the burden of any tax. It would be neither fair nor sensible to make the vendor bear the burden of the tax where it is in the worst possible situation—where it has parted with the merchandise and received nothing in exchange—and the State has never, so far as I am aware, sought to do so. But it is equally anomalous, where the vendor has passed the risk of collection on to a third-party assignee, to make that assignee bear the sales tax burden in cases where the customer pays nothing. By promulgating 20 NYCRR 534.7 (b) (3), respondent Commissioner of Taxation and Finance has created just this anomaly.
 

 We rejected an effort by the State Tax Commission to achieve a similarly irrational result in
 
 Matter of Abraham & Straus v Tully
 
 (47 NY2d 207 [1979]). In that case, the State Tax Commission did not go as far as the Commissioner has done in this case; it did not try to collect a tax where the purchaser paid nothing, but it did try to collect more than the appropriate percentage of what the purchaser paid. In cases where customers had paid only part of the purchase price, the Commission allocated the payments to sales tax first and to the purchase price thereafter. Thus, as we said in our opinion, if the purchase price of an item subject to a 5% tax were $100, but the customer paid only $20, the State Tax Commission would allocate $5 to sales tax and $15 to the purchase price. As a result, we explained, “the effective tax rate on the portion of the purchase price actually received will be 33V3%” (47 NY2d at 213).
 

 
 *262
 
 We rejected this approach as inconsistent with both the statute (Tax Law § 1132 [e]), and the regulation implementing it (20 NYCRR 525.5 [a]). We said:
 

 “The interpretation placed on [subdivision (e)] of section 1132 of the Tax Law and on regulation 525.5 (a) by the Sales Tax Bureau and by the State Tax Commission in this proceeding would all but emasculate the statute and regulation. The statute and the regulation obviously intend that a vendor shall be relieved of sales tax liability to the extent that the receipt from a sale proves uncollectible, so that the taxes which the vendor is required to remit will most closely reflect the tax due
 
 on moneys actually received
 
 on sales of personal property. The method employed by the bureau and approved by the commission, by which it is assumed that the first cash received by a vendor on a credit sale is for the entire sales tax due on the sale, would have quite the contrary result and, by reason of the fact that the receipts under consideration are by their nature not fully collectible, would inevitably produce a liability for sales taxes which would deviate from the statutory sales tax rate”
 
 {id.
 
 at 212-213 [emphasis added]).
 

 We found the State Tax Commission’s interpretation of the statute and regulation in
 
 Abraham & Straus
 
 to be “irrational and unreasonable”
 
 {id.
 
 at 214). In this case, the Commissioner has embodied his interpretation of the statute in a regulation, but his interpretation is no less unreasonable. The Commissioner refuses to reduce tax liability “to the extent that the receipt from a sale proves uncollectible” and is collecting not just a tax in excess of the statutory rate “on moneys actually received,” but a tax where no money is received at all.
 

 Our decision in
 
 Abraham & Straus
 
 followed the logic of an earlier Appellate Division case raising the same issue,
 
 Matter of Yonkers Plumbing & Heating Supply Corp. v Tully
 
 (62 AD2d 18 [3d Dept 1978]). There the Court, rejecting the State Tax Commission’s view that “100% of the tax must be collected before a vendor receives any money” said: “It is inconceivable that the Legislature intended to tax a sale never consummated” (62 AD2d at 20). I agree, and I believe that is the implication of our holding in
 
 Abraham & Straus.
 

 Respondents argue, however, and the Court today agrees, that the Legislature did authorize collection of tax on purchase
 
 *263
 
 prices that are never paid. This conclusion is based on the word “may” in Tax Law § 1132 (e): “The tax commission
 
 may
 
 provide, by regulation, for the exclusion from taxable receipts ... of amounts representing sales where the contract of sale has been cancelled, the property returned or the receipt . . . has been ascertained to be uncollectible or, in case the tax has been paid upon such receipt ... for refund of or credit for the tax so paid.” (Emphasis added.)
 

 The majority reads this language as authorizing the Commissioner (the successor to the State Tax Commission) to make no provision at all for such exclusions, refunds or credits if he chooses—thus producing the result, “inconceivable” to the
 
 Yonkers Plumbing
 
 court, of a sales tax where there is no sales transaction. According to the majority, the Commissioner could, simply by not issuing the regulations which section 1132 (e) says he “may” issue, exact tax on money never received. It is implicit in the majority’s logic that the Commissioner could require payment of tax not only where a debt is uncollectible, but “where the contract of sale has been cancelled” or “the property returned.” The Commissioner has not imposed such a tax, but by not doing so, in the majority’s view, the Commissioner is doing vendors a favor—the majority describes it as a “benefit” which “offsets the significant responsibilities imposed on [vendors] and fosters the trustee relationship between the vendors and the State” (majority op at 256). The Commissioner is under no obligation, the majority reasons, to do a similar favor for assignees who are not trustees for the receipt of sales tax.
 

 I think the majority misreads the statutory scheme. The whole policy of the statute, as reflected in the provisions I summarized above, is to tax the purchaser, not the vendor. It is a tax on “receipts.” The statute does indeed define “receipts” to include amounts for which credit is extended, but it is quite another thing to include amounts for which credit is extended
 
 that are never paid.
 
 It would be a very strange definition of “receipts” that included amounts never received at all, and I see no basis for believing that the Legislature intended such a definition. On the contrary, I conclude from reading the statutes that a sales tax on a nonsale was as “inconceivable” to the Legislature as it was to the Court in
 
 Yonkers Plumbing,
 
 and that the Legislature assumed that, one way or another, sales tax proceeds would come only out of the prices that purchasers actually paid.
 

 
 *264
 
 The Legislature did not provide the mechanism by which the collection of tax on unconsummated transactions should be avoided. Instead, it provided in Tax Law § 1132 (e) that the Tax Commission “may” devise whatever mechanisms it thought suitable—exclusion from receipts, refunds and credits. The word “may” was surely intended to give the Tax Commission (and now, the Commissioner) much flexibility. Not only “may” the Commissioner make reasonable choices among the mechanisms—exclusion, credit and refund—mentioned in the statute, but I have no doubt that he “may” adopt administratively convenient shortcuts, even if they do not achieve theoretically perfect results. For example, the Commissioner could require vendors to use a simple and intelligible formula for calculating uncollectible amounts, even if that formula did not perfectly exclude every penny that was not collected. I cannot believe, however, that the word “may” was intended to let the Commissioner reverse the plain intent of the legislation he is enforcing by in effect imposing a tax on vendors who are unlucky enough to be stiffed by their customers.
 
 [1]
 

 In short, I do not believe that it would have been within the discretion of the Commissioner to decide to permit
 
 no
 
 exclusions, credits or refunds for uncollectible debts. If I am right in this, the basis for the majority’s conclusion in this case falls away. The Commissioner’s decision to allow, by regulation, credits or refunds for uncollectible debts cannot be interpreted as a gracious favor given by the Commissioner to vendors, which he can withhold from those who are not vendors and therefore not “trustees.”
 

 It remains to consider whether any other justification warrants what the Commissioner purports to do in 20 NYCRR 534.7 (b) (3): to deny a refund or credit, and thus effectively tax an unconsummated sale, in those cases where the transaction has been financed by, or a debt assigned to, a third party.
 

 Respondents argue that Tax Law § 1132 (e) not only permits, but requires, the distinction that section 534.7 (b) (3) makes between vendors and vendors’ assignees; that assignees are not, under the statute, eligible for a refund when debts are uncollectible. The majority does not accept this argument; indeed, it
 
 *265
 
 implicitly rejects it, for it upholds section 534.7 (b) (3) as a proper exercise of the Commissioner’s discretion, not as obedience to a statutory command. I believe the respondents’ argument is without merit.
 

 Respondents’ theory is that section 1132 (e), in authorizing regulations that provide for exclusion, refund or credit of taxes paid on uncollectible debts, limits the benefit of such regulations to “vendors” and excludes vendors’ assignees. The first problem with this argument is that the word “vendors” does not appear in section 1132 (e). However, that statute refers to exclusion from taxable “receipts,” and respondents argue that only vendors can have “receipts” within the meaning of the statute. Tax Law § 1101 (b) (3) defines “receipt” as “[t]he amount of the sale price of any property and the charge for any service taxable under this article . . . valued in money, whether received in money or otherwise” and goes on to state certain specific inclusions in, and an exclusion from, this definition. Thus, the essential definition of “receipt” does not use the word “vendor.” The specified inclusions do; they qualify the definition of “receipts” as “including any amount for which credit is allowed by the vendor to the purchaser . . . and also including any charges by the vendor to the purchaser for shipping or delivery . . . regardless of whether such shipping or delivery is provided by such vendor or a third party.” If the definition is read literally and with care it does not say that only “vendors” can have “receipts.” It says only that “receipts” are inclusive of certain credits or charges allowed or imposed by “vendors.” Thus even on a literal level, respondents’ argument fails.
 

 Ignoring this, respondents infer from the mere mention of the word “vendor” in Tax Law § 1101 (b) (3) an intention by the Legislature that the exclusion from taxable “receipts” authorized by Tax Law § 1132 (e), and the credits and refunds also authorized by that statute, can benefit only vendors themselves and not their assignees. I believe the idea the Legislature was trying to communicate such a limitation when it included the word “vendor” in subordinate clauses of the definition of “receipts” is absurd.
 

 Indeed, even if Tax Law § 1132 (e) said that the Commissioner was authorized to allow “vendors” to exclude bad debts from their receipts, respondents’ argument would still be a weak one. When a statute gives a person a right of action it is ordinarily understood to imply the same right in that person’s successors in interest, including assignees. Even apart from
 
 *266
 
 General Obligations Law § 13-101, which I discuss below, the normal presumption in the law is that a person entitled to payment may assign his or her rights, where no contrary intention is expressed.
 
 (Melino v National Grange Mut. Ins. Co.,
 
 213 AD2d 86, 88 [3d Dept 1995];
 
 Scarfe v Lorom,
 
 141 NYS2d 196, 197-198 [Sup Ct, Onondaga County 1955] [the law favors free assign-ability of choses in action unless expressly forbidden by statute or against public policy];
 
 Puget Sound Natl. Bank v State Dept. of Revenue,
 
 123 Wash 2d 284, 868 P2d 127 [1994] [holding sales tax refund claims to be assignable];
 
 People ex rel. Stone v Nudelman,
 
 376 111 535, 539-540, 34 NE2d 851, 853 [1940] [holding credit issued for erroneous payment of tax assignable].)
 

 There is not the slightest indication in Tax Law § 1132 (e) that the Legislature intended to exclude assignees, or that it gave any thought to the question. Respondents surely would not even contend that all successors in interest to “vendors” are excluded: obviously, if a vendor is an individual and dies, the refund can be collected by his or her executors; if the vendor is a corporation that is merged out of existence, the refund can be collected by the successor entity. Nothing in the statute indicates that an assignee should be on any different footing.
 

 I consider one final possible argument in support of the validity of 20 NYCRR 534.7 (b) (3) under the Tax Law. As I have explained above, while I believe that the Legislature intended to impose sales tax only on transactions in which a purchase price was actually paid, I recognize that practical considerations might trump the perfect attainment of that goal. Thus I think we should seriously consider an argument that the Commissioner’s disparate treatment of cases where there is an assignment and cases where there is not is justified by some administrative reason.
 

 But respondents’ brief in this Court makes no such argument, and the issue of administrative convenience is barely touched on in the decisions of the Administrative Law Judge and respondent Tax Appeals Tribunal rejecting petitioner’s claim. The Tribunal, at the end of its lengthy opinion, does say that without a “connection between an applicant [for refund], the person responsible for collecting the tax and the underlying transaction, the field of potential refund or credit applicants . . . would be virtually limitless and the orderly administration of the sales tax rendered unworkable.” But the Tribunal neither states the facts underlying this conclusion nor explains how it was arrived at. Similarly, at the oral argument in this
 
 *267
 
 Court, respondents’ counsel, in response to questioning, asserted in conclusory fashion that it would be “unwieldy” for the Department to pursue assignees, because the pursuit could involve unraveling numerous complex transactions. The oral argument by petitioner’s counsel on the same subject was more specific and more persuasive: he said that the Department of Taxation and Finance now deals with 640,000 vendors; that there are no more than a few dozen assignees, chiefly large credit card companies who purchase debt from many vendors; and that it would in fact be administratively easier for the Department to deal with assignees than vendors.
 

 In any event—even assuming we could consider a justification for the regulation that is supported by no more than conclusory assertions—the “administrative convenience” argument is not viable. Section 534.7 (b) (3), on its face, is not designed just to save the Department whatever added trouble there may be in dealing with assignees rather than vendors. The regulation does not say that only a vendor may apply for a refund or credit; if it said that, presumably vendors and their assignees could structure their transactions so that the vendor would get the refund and pay it to the assignee. The regulation flatly forbids any refund or credit to anyone in a “transaction which is financed by a third party or for a debt which has been assigned to a third party.” Thus, the regulation requires that in all such transactions, the applicable percentage of the customer’s unpaid obligation will remain in the state treasury.
 

 I therefore conclude that administrative convenience and efficiency are not the reasons for, and do not justify, section 534.7 (b) (3). Indeed, I can think of only one reason for the regulation: it effectively transfers money from private firms to the State.
 
 [2]
 
 I am not shocked that the Commissioner of Taxation and Finance finds this an attractive result, but I do not believe the Legislature has authorized the Commissioner to accomplish that result in this case. I therefore conclude that section 534.7 (b) (3) is invalid because it is inconsistent with the Tax Law.
 

 
 *268
 
 II
 

 I also believe that section 534.7 (b) (3) is inconsistent with General Obligations Law § 13-101, which provides:
 

 “Any claim or demand can be transferred, except in one of the following cases:
 

 “1. Where it is to recover damages for a personal injury;
 

 “2.
 
 Where it is founded upon a grant, which is made void by a statute of the state; or upon a claim to or interest in real property, a grant of which, by the transferrer, would be void by such a statute;
 

 “3. Where a transfer thereof is expressly forbidden by: (a) a statute of the state, or (b) a statute of the United States, or (c) would contravene public policy.”
 

 I find it hard to imagine a regulation more directly contrary to this statute than one that says, as 20 NYCRR 534.7 (b) (3) does, that a refund or credit otherwise available “is not available ... for a debt which has been assigned to a third party.” Indeed, the decisions in this case of both the Administrative Law Judge and the Tax Appeals Tribunal appear to acknowledge that section 534.7 (b) (3) is inconsistent with General Obligations Law § 13-101, and the Appellate Division assumed, without deciding, that that was correct. Nevertheless, all three found section 534.7 (b) (3) to be valid. The Tax Appeals Tribunal and the Appellate Division based this holding on the theory that Tax Law § 1132 (e), which in their view authorized the promulgation of section 534.7 (b) (3), was enacted subsequent to General Obligations Law § 13-101, and thus superseded it. In other words, the Tax Appeals Tribunal and the Appellate Division held that section 1132 (e) impliedly repealed section 13-101, insofar as section 13-101 applied to claims for sales tax refunds. Respondents’ brief also argues that section 1132 (e) is a “later-enacted, specific” provision which “governs” to the extent it conflicts with section 13-101.
 

 It is well established that repeals by implication are not favored
 
 (see Matter of Consolidated Edison Co. ofN.Y. v Department of Envtl. Conservation,
 
 71 NY2d 186, 195 [1988];
 
 Alweis v Evans,
 
 69 NY2d 199, 204 [1987];
 
 People v Newman,
 
 32 NY2d 379, 390 [1973]). Unless there is clear evidence of a legislative design to repeal an earlier piece of legislation, “we must, if at
 
 *269
 
 all possible, give full effect to both statutes”
 
 (Newman,
 
 32 NY2d at 389). It is only when the statutes “are in such conflict that both cannot be given effect” that a repeal by implication may be found
 
 (Matter of Board of Educ. v Allen,
 
 6 NY2d 127, 142 [1959]).
 

 With respect, I find the idea that Tax Law § 1132 (e) so clearly contradicts General Obligations Law § 13-101 that the former impliedly repeals the latter to be extremely farfetched. Section 13-101 is a statute dealing with the transferability, or assign-ability, of claims. Section 1132 (e) says not a word on that subject. The logic by which respondents find an implied repeal in section 1132 (e) is the same chain of reasoning that I described above, in which respondents argue that assignees are not eligible for refunds under section 1132 (e). That is, respondents start from the word “receipts” in section 1132 (e), find the word “vendor” in two subordinate clauses in the definition of “receipt,” and infer from that that only a vendor, and not a vendor’s assignee, can have “receipts”; thus respondents conclude, assignees may not benefit from section 1132 (e). As I said above, I see not the slightest warrant for believing that is what the Legislature was thinking when it wrote section 1132 (e). A fortiori, section 1132 (e) is not the sort of clear prohibition on assignment that would justify finding an implied repeal of the General Obligations Law section.
 

 In addition to making the implied repeal argument, respondents argue that the prohibition on assignment contained in 20 NYCRR 534.7 (b) (3) is valid under the “public policy” exception of General Obligations Law § 13-101 (3). Respondents’ “public policy” argument, however, is but another iteration of their theory that section 1132 (e) is a prohibition on assignment. I find it no less difficult to find an anti-assignment “public policy” in section 1132 (e) than I do to find an implied repeal.
 

 The majority’s discussion of General Obligations Law § 13-101 does not track either respondents’ “implied repeal” or “public policy” argument. But the majority does find that section 534.7 (b) (3) is within the public policy exception in General Obligations Law § 13-101 (3). The majority’s reasoning, if I understand it correctly, is that, since (in the majority’s view) section 534.7 (b) (3) is consistent with the Tax Law, that regulation “has the force and effect of law” and is therefore an embodiment of “public policy” (majority op at 258). I believe this is a bootstrap argument which contradicts the plain intent of General Obligations Law § 13-101.
 

 
 *270
 
 Section 13-101 (3) contains two exceptions to the general rule of assignability: one “[w]here a transfer ... is
 
 expressly
 
 forbidden
 
 by
 
 . . . statute” and another where it “would contravene public policy.” No one can argue that Tax Law § 1132 (e) expressly forbids assignment of claims for refund or credit of sales tax. The majority holds only that it implicitly authorizes the Commissioner to promulgate a regulation forbidding such assignments. If a regulation, promulgated pursuant to implicit statutory authorization, is enough by itself to invoke the second, “public policy,” exception, then the restrictive language the Legislature used to define the first exception is meaningless. Why did the authors of General Obligations Law § 13-101 (3) require “express” statutory language if a regulation, not “expressly” authorized, is all that is needed to create “public policy”?
 

 The majority relies on General Obligations Law § 13-105 and on
 
 Matter of Medical Socy. of State of N.Y. v Serio
 
 (100 NY2d 854 [2003]). I believe the reliance on section 13-105 to be erroneous, for section 13-105 applies only “[w]here a claim or demand
 
 can
 
 be transferred.” (Emphasis added.) Section 13-105 provides, in substance, that a claim, once transferred, can be litigated in the same manner as though it had not been transferred, except where the issue is “regulated by special provision of law.” Since the regulation that the majority upholds provides that claims for sales tax refunds
 
 cannot
 
 be transferred, I do not see how section 13-105 comes into the picture.
 
 [3]
 
 In any event, I do not believe that Tax Law § 1132 (e), or any of the other provisions of law the majority cites, can be read as governing the way in which transferred claims may be litigated.
 

 As for
 
 Medical Society v Serio,
 
 I find it relevant here only by contrast. The claims at issue in
 
 Medical Society
 
 were claims of beneficiaries of no-fault insurance to “benefits for non-health-related services (typically housekeeping and transportation expenses)” (100 NY2d at 871). The Superintendent of Insurance had determined that “questionable claims for transportation or housekeeping expenses” were being assigned to health care providers and that a prohibition on such assignments was “necessary to reduce [such] abuses”
 
 (id.
 
 at 871-872). This seems to me a classic example of the sort of restriction on assignment
 
 *271
 
 that the “public policy” exception in General Obligations Law § 13-101 (3) permits.
 
 Medical Society
 
 does not suggest, as the majority does here, that the mere existence of a regulation created a “public policy”; rather,
 
 Medical Society
 
 identified an important public policy that made the regulation appropriate. Here, as I have explained, I cannot see any meaningful “public policy” that is served by the regulation under attack—unless the goal of collecting more tax money than the statute authorizes could be called a “public policy.”
 

 Accordingly, I would reverse the order of the Appellate Division and direct that petitioner’s refund claims be granted.
 

 Chief Judge Kaye and Judges G.B. Smith, Ciparick and Rosenblatt concur with Judge Graffeo; Judge R.S. Smith dissents and votes to reverse in a separate opinion; Judge Read taking no part.
 

 Judgment affirmed, with costs.
 

 [1]
 

 . The dissent suggests that we are placing too much emphasis on the use of the word “may” in section 1132 (e) (dissenting op at 260). But this is, in part, a statutory construction case, requiring us to carefully parse the language chosen by the Legislature. We have previously recognized that the term “may” is permissive
 
 (see e.g. Matter of Scoglio v County of Suffolk,
 
 85 NY2d 709 [1995]) and, in
 
 Abraham & Straus,
 
 we did not reject the view that the Commissioner had discretion under section 1132 (e) to decide whether to provide any party with a refund arising from an uncollectible debt (47 NY2d at 214). We see no reason now to decline to give effect to the Legislature’s selective terminology, particularly since mandatory language appears in another sales tax refund provision enacted at the same time. In contrast to the use of the word “may” in section 1132 (e), the Legislature directed that the Division
 
 “shall
 
 refund or credit any tax, penalty or interest erroneously, illegally or unconstitutionally collected or paid,” provided the taxpayer files a timely application (Tax Law § 1139 [a] [emphasis added]). Thus, if sales tax was never owed in the first place, the Commissioner must refund it but when the tax was properly collected as occurred here, refunds are allowed but not required. We will not presume that the Legislature meant “shall” when it said “may.”
 

 [2]
 

 . It should be noted that the underlying contracts later assigned to petitioner were between the customers and the retail vendors—the Division of Taxation was not a party. For purposes of this appeal, we assume, without deciding, that as between petitioner and the retail vendors, the agreement assigning the right to collect the debts from the customers was intended also to assign the ancillary right to file a sales tax refund claim with the Division. This assumption is central to this dispute for petitioner claims that it obtained from the retail vendors the right to
 
 apply
 
 for the refunds directly from the Division, not merely the right to receive any proceeds of refund claims filed by the vendors.
 

 [3]
 

 . The dissenter’s argument that the Legislature could not have conceived of sales taxes being paid in circumstances where a purchaser paid nothing is refuted by express language in the sales tax statutes. Tax Law §
 
 1105
 
 (a) states that “there is hereby imposed and there shall be paid a tax of four and one-quarter percent upon . . . [t]he receipts from every retail sale of tangible personal property.” Receipts are defined as “[t]he amount of the sale price of any property and the charge for any service taxable under this article, . . . valued in money,
 
 whether received in money or otherwise, including any amount for which credit is allowed by the vendor to the purchaser”
 
 (Tax Law § 1101 [b] [3] [emphasis added]). And a retail sale encompasses “[a]ny transfer of title or possession or both . . . conditional or otherwise, in any manner or by any means whatsoever for a consideration,
 
 or any agreement therefor”
 
 (Tax Law § 1101 [b] [5]; [b] [4] [emphasis added]). Under these statutes, sales taxes are due when property is transferred in exchange for an agreement to pay in the future, even though the purchaser pays nothing at the time of the sale transaction. Although the dissent is skeptical that a receipt can include money not actually received, the definitions adopted by the Legislature so provide.
 

 [4]
 

 . This “unconsummated sale” phraseology is drawn from an Appellate Division decision
 
 (see Matter of Yonkers Plumbing & Heating Supply Corp. v Tully,
 
 62 AD2d 18 [3d Dept 1978],
 
 appeal dismissed
 
 44 NY2d 949 [1978]) and not from any statute or decision of this Court. Although
 
 Tully
 
 was decided before
 
 Abraham & Straus,
 
 this Court did not adopt the “unconsummated sale” rationale. Rather, the transactions are taxable—the sales are “consummated” for sales tax purposes—when property is transferred to the customers.
 

 [1]
 

 . We said in
 
 Abraham & Straus
 
 that “we do not reject the view . . . that it was within the discretion of the Tax Commission whether to provide for any credit or refund resulting from uncollectible credit transactions” (47 NY2d at 214). We did not say, however, “we accept the view.” We did not reach the question.
 

 [2]
 

 . I am bemused by the majority’s suggestion that “[p]etitioner has not borne any sales tax burden” (majority op at 259). The State has obviously collected and retained a sales tax; the purchasers have borne no burden, for they paid nothing; and, by the majority’s reasoning, the whole point of the regulation is to avoid burdening trustee-vendors. If the assignees are bearing no burden, the State has apparently achieved a miracle—it has collected a tax without burdening anyone.
 

 [3]
 

 . Respondents cite section 13-105 in their brief, but only to argue that this provision “does not help [petitioner’s] argument.” Respondents do not argue that it helps their own.